**AFFIRM; and Opinion Filed July 7, 2014.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-13-01109-CR
### No. 05-13-01110-CR

**FERRIOUS CANNON, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court No. 5**
**Dallas County, Texas**
**Trial Court Cause Nos. F12-31283-L & F12-31231-L**

## OPINION

Before Justices Fillmore, Evans, and Lewis
Opinion by Justice Fillmore

A jury convicted Ferrious Cannon of aggravated sexual assault and aggravated robbery, each committed with a deadly weapon, and assessed punishment of twenty-five years' confinement for each conviction. In three issues in each case, Cannon argues (1) the conviction is void because the trial court lacked jurisdiction to hear the case, and (2) he was egregiously harmed because, in its charge to the jury, the trial court failed to limit the definitions of intentionally and knowingly to the applicable conduct elements and included a definition of reasonable doubt. In two additional issues in the aggravated robbery case, Cannon argues the evidence is insufficient to prove identity and the trial court erred by failing to instruct the jury that a certain witness was an accomplice as a matter of law. We affirm the trial court's judgments.

## Background

Detective Scesney, of the major crimes unit of the Grand Prairie Police Department, testified that, on the evening of July 24, 2012, he was called to a Pizza Hut about a robbery and rape. The manager of the restaurant told Scesney that A.B., a female driver, had taken a "pretty large order of pizza and other items" to 2001 Osage, in Grand Prairie, which turned out to be a vacant house, and that A.B. was attacked and raped when she arrived at the house. Scesney drove to the vacant house where he saw a large volume of blood on the curb and porch, some broken eye glasses, and a pair of women's panties near the entryway of the house. Scesney photographed the scene, then drove to the hospital to interview A.B.

A.B. was "scared [and] shaking" and had a large protrusion on the side of her head from numerous blows. Scesney described A.B. as "destroyed" and "a complete wreck." A.B. told Scesney about the attack and indicated the men involved either got in or tried to get in her car. Scesney was unable to get fingerprints from the car, but did get the phone number that was used to place the pizza order. Scesney traced the phone number and discovered an email address associated with the phone account. That email address belonged to Joel Steele.

Scesney prepared a photographic line-up that included Steele. A.B. did not recognize Steele; instead she picked out the photograph of a "filler," someone whose photograph was included to make a complete line-up. After Scesney determined the "filler" was not associated with the crime, he looked at Steele's Facebook account and discovered that one of Steele's friends, Ronnie Higgs, looked "remarkably similar" to the "filler," so much so that "they could be brothers." Scesney investigated Higgs and discovered he lived five houses down an alley from the location of the attack. After Higgs was arrested on unrelated outstanding warrants, Scesney interviewed him.

Higgs admitted to Scesney that he was involved in the robbery. He gave details of the event and said he was standing on the porch when A.B. arrived. Higgs told Scesney that Cannon came up behind A.B. and struck her several times with a gun. Higgs also said Steele made the phone call to order the pizza. Scesney talked to Steele who confirmed he made the phone call, but said he was called home by his mother and was not there during the offenses. Scesney confirmed the details from the accounts both men gave to ensure they were telling the truth. In addition, Scesney interviewed various people who saw Cannon shortly after A.B. was attacked, including Jadderius Freshwater, Dillon Charles, Andrew Holland, Xavier Evans, and Marquise Spicer. These individuals, who were not involved in the offenses, confirmed details of the attack.

In light of the information Scesney obtained, police secured a search warrant for Cannon's house. However, when they tried to execute the warrant, Cannon was not home, and his family told police he lived at another location. Scesney finally obtained a second address for Cannon and secured a search warrant for the second address. Cannon was present at the house when Scesney executed the warrant and was arrested.

Higgs testified he was friends with both Cannon and Steele. On July 24, 2012, he and Steele were "hanging out" at Higgs's house. Steele wanted to rob a pizza man, and they called Cannon who said he wanted to participate. The three discussed whether they would go through with the robbery if the delivery person was female. Steele and Higgs said they would not, but Cannon said he did not care. After they got a pellet gun from a neighbor, Steele placed the pizza order because he knew how to use an "app" on his cell phone that would make the call appear to be from a different phone number. According to Higgs, Steele left, and Higgs and Cannon went to the vacant house to wait. Once the pizza delivery car showed up, Cannon "took off running through the alley." Higgs started chatting with the driver, then pretended to call his mother and

ask about the money for the pizza. Cannon then came up behind her and hit her in the head with the gun. Higgs grabbed the pizza and ran home. Cannon came to Higgs's house about thirty minutes later. Cannon told Higgs what he had done and showed Higgs a video he took with his phone. In the video, there was blood everywhere. A.B. was naked except for her bra and had a shirt or pants over her face. Higgs verified it was Cannon's voice on the video.

Dillon Charles knew Cannon, Higgs, and Steele. On the evening of July 24, 2012, Charles was "hanging out" with friends when Cannon rode by on his bike, carrying some pizza. Charles called out to Cannon, and he stopped. Cannon told Charles he took the pizza from the "pizza lady" and showed Charles a video on his cell phone of Cannon, holding a BB gun, demanding money from A.B. who was wearing only a bra. In the video, A.B. tells Cannon where the money is, and he walks to her car, opens the door, and takes the money.

Jadderius Freshwater was "hanging out" with Charles and others on July 24, 2012, and testified to similar facts as to those testified to by Charles. According to Freshwater, Cannon told them he "had hit a lick," meaning he robbed someone, and took the pizza. Freshwater also saw the video in which a "lady [was] laying on the ground" in her underwear. On the video, Cannon was holding a gun and asking her where the money was located.

Sixteen-year-old Steele testified he had been friends with Cannon and Higgs since sixth grade. They were "hanging out" in Higgs's garage on July 24, 2012. A friend named Dre Scott drove by, and they chatted. Scott had a BB gun that he let Steele and Higgs borrow, and they practiced shooting at the fence. Around 8:00 p.m., Cannon showed up so they could commit a robbery, what they called "hitting a lick." Steele used a cellular phone "app" to place the call to Pizza Hut so it would show a different number. Steele gave the address of a vacant house which was within walking distance of Higgs's home. According to Steele, if the delivery person was male, they would beat him up, take the pizza, and run. But if the person was female, neither

–4–

Steele nor Higgs would do it; they were going to walk away. Cannon, however, said he did not care if the driver was female. The three went to the vacant house but shortly thereafter, Steele's mother called and told him to return home because it was getting dark. Cannon later told Steele he hit the pizza delivery lady with the gun, told her to count to 200, took the pizza, and ran.

A.B. testified she worked as a pizza delivery driver for Pizza Hut for about five years. She arrived at the address given on the order and saw Higgs. They made small talk, then he got on the phone to talk to someone. He walked to the porch and disappeared around the corner of the house. A.B. started to wonder what was going on and decided to return to her car. She placed the pizzas on the trunk and grabbed her cell phone, placing it in her pocket. While standing there, she noticed a tall slender black male across the street. She assumed he had nothing to do with why she was there, so she did not pay any more attention to him. In the meantime, Higgs reappeared and started to walk toward her. She heard him say, "Yes, that's her. That's her by the trunk." Within seconds, she was struck on the side of her head several times. She immediately threw up her hands and fell to the ground on her knees. Blood began pouring down her face. She screamed, and someone told her to "Shut up, or we'll shoot you." She grabbed the money she had in her pocket and threw it. She told them to "take whatever you want. Just take it. Please, just leave me. You have the food. You have the money. Just please leave me where I am."

A.B. said it got "eerie quiet," then a male voice told her to get up and walk toward the house. He asked if she was a virgin, then told her she needed to take her clothes off. He first told her to perform oral sex on him but she told him her mouth was full of blood. He then had had her lie on her back, covered her face with her shirt, and digitally penetrated her vagina with his fingers. A.B. could see a bright light through the fibers of the shirt, like "a camera light on a phone." A.B. remembered she had a ten dollar bill in her car and told the man about the money.

He told her to count to 200, but returned before she could finish because he could not find the money. After she told him to look under the sun visor, he left and did not return. When she was certain no one was still there, A.B. grabbed her clothes, got in her car, and drove back to the Pizza Hut. The employees there called an ambulance. A.B. sustained significant bruises and scraped knees, and needed three staples to close the wounds from the gun striking her.

John Hauger, special agent with the Kansas division of the FBI, works on the nationwide cellular analysis survey team. He testified that, although he could not tell the exact location a phone is used, he could determine a general area of usage. He analyzed Cannon's phone records and confirmed, based on Cannon's phone usage on the evening of July 24, 2012, that Cannon was using his phone in an area near the vacant house.

Cannon was charged in two cases with aggravated sexual assault and aggravated robbery, each committed with a deadly weapon. After finding Cannon guilty of both offenses, the jury assessed punishment at twenty-five years' confinement in each case.

## Jurisdiction

In his third issue in the aggravated sexual assault case and his fifth issue in the aggravated robbery case, Cannon complains Criminal District Court No. 5 lacked jurisdiction over his cases because they were not properly transferred to the court's docket. He argues the cases were presented to, and indictments returned in, Criminal District Court No. 7, but the records contain no orders transferring the cases to Criminal District Court No. 5, where the cases were heard and the judgments rendered. Cannon argues that, because Criminal District Court No. 5 never acquired jurisdiction over his cases, the trial court's judgments are void.

We have previously considered this argument and rejected it.  *See Bourque v. State*, 156 S.W.3d 675, 678 (Tex. App.—Dallas 2005, pet. ref'd).[1]  A grand jury formed and impaneled by a district court is empowered to inquire into offenses liable to indictment. TEX. CODE CRIM. PROC. ANN. art. 20.09 (West 2005); *Ex parte Edone*, 740 S.W.2d 446, 448 (Tex. Crim. App. 1987).  After the conclusion of testimony on an offense liable to indictment, the grand jury will vote concerning the "presentment of an indictment."  TEX. CODE CRIM. PROC. ANN. art. 20.19 (West 2005); *Ex parte Edone*, 740 S.W.2d at 448.  Following presentment, an indictment is filed in a court with jurisdiction to hear the case.  *Bourque*, 156 S.W.3d at 678; *see also Hultin v. State*, 171 Tex. Crim. 425, 351 S.W.2d 248, 255 (1961).

"District Judges may exchange districts, or hold courts for each other when they may deem it expedient, and shall do so when required by law."  Tex. Const. art. V, § 11.  In a county having two or more district courts,

> the district judges may adopt rules governing the filing and numbering of cases, the assignment of cases for trial, and the distribution of the work of the courts as in their discretion they consider necessary or desirable for the orderly dispatch of the business of the courts.

TEX. GOV'T CODE ANN. § 24.024 (West Supp. 2013); *see also* TEX. GOV'T CODE ANN. § 74.093 (West 2013) (addressing adoption of local rules of administration to provide, in part, for assignment, docketing, transfer, and hearing of all cases).  Subject to such local rules of administration, any district court in a county may transfer a case to another district court in the county, "hear and determine any case or proceeding pending in another district court in the county without having the case transferred," "sit for another district court in the county and hear and determine any case or proceeding pending in that court," or "temporarily exchange benches with the judge of another district court in the county," among other powers of transfer or

---

[1] *See also Baltierra v. State*, No. 05-10-01104-CR, 2012 WL 677514, at *3-4 (Tex. App.—Dallas Mar. 2, 2012, no pet.) (mem. op., not designated for publication); *Crespin v. State*, No. 05-10-00784-CR, 2011 WL 693266, at *1 (Tex. App.—Dallas Feb. 28, 2011, pet. ref'd) (mem. op., not designated for publication)

exchange of cases. TEX. GOV'T CODE ANN. § 24.003 (West Supp. 2012). Thus, in a county with two or more district courts, the court impaneling a grand jury will not necessarily, and need not, be assigned an indictment presented by that grand jury. *See Bourque*, 156 S.W.3d at 678.

Here, the records show the grand jury was impaneled in Criminal District Court No. 7. Following the return of Cannon's indictments, the cases were filed in Criminal District Court No. 5. Nothing in the record indicates the cases were originally filed in or appeared on the trial docket of Criminal District Court No. 7. Because Criminal District Court No. 5 had jurisdiction to hear the cases and render the judgments, we resolve Cannon's third issue in the aggravated sexual assault case and fifth issue in the aggravated robbery case against him.

### Sufficiency of the Evidence

In his first issue in the aggravated robbery case, Cannon contends the evidence is insufficient to support his conviction because it fails to establish identity. Specifically, Cannon claims that, when the testimony of his accomplice, Higgs, as well as that of Steele, who Cannon claims should have been an accomplice as a matter of law, is excluded, there is insufficient evidence that he committed the crime.

We review the sufficiency of the evidence under the standard set out in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Matlock v. State*, 392 S.W.3d 662, 667 (Tex. Crim. App. 2013). We examine all the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Matlock*, 392 S.W.3d at 667. However, a challenge of insufficient corroboration is not the same as a challenge of insufficient evidence to support the verdict as a whole. *Cantelon v. State*, 85 S.W.3d 457, 460 (Tex. App.—Austin 2002, no pet.) (citing *Cathey v. State*, 992 S.W.2d 460, 462−63 (Tex. Crim. App. 1999)). Rather, to corroborate accomplice-witness testimony, "[a]ll the law requires is that there be *some* non-

accomplice evidence which *tends* to connect the accused to the commission of the offense." *Id.* (quoting *Hernandez v. State*, 939 S.W.2d 173, 178–79 (Tex. Crim. App. 1997)); *see* TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2005) (conviction cannot stand upon accomplice testimony unless corroborated by other evidence that tends to connect defendant with offense). Thus, corroboration is not sufficient if it merely shows the offense was committed. TEX. CODE CRIM. PROC. ANN. art. 38.14; *Smith v. State*, 332 S.W.3d 425, 439 (Tex. Crim. App. 2011). To determine the sufficiency of the corroboration, we eliminate all of the accomplice testimony from consideration and then examine the remaining portions of the record to see if there is any evidence that tends to connect the accused with the commission of the offense. *Castillo v. State*, 221 S.W.3d 689, 691 (Tex. Crim. App. 2007). An accomplice is one who participated in the offense before, during, or after its commission with the requisite mental state. *Smith*, 332 S.W.3d at 439.

The corroborating evidence may be direct or circumstantial, and need not be sufficient by itself to establish the defendant's guilt. *Id.* at 442; *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008). It may confirm a "mere detail" rather than the elements of the offense. *Lee v. State*, 29 S.W.3d 570, 577 (Tex. App.—Dallas 2000, no pet.). Even "apparently insignificant incriminating circumstances" may provide sufficient corroboration. *Trevino v. State*, 991 S.W.2d 849, 852 (Tex. Crim. App. 1999) (quoting *Dowthitt v. State*, 931 S.W.2d 244, 249 (Tex. Crim. App. 1996)). We look at the particular facts and circumstances of each case and consider the combined force of all the non-accomplice evidence that tends to connect the accused to the offense. *Smith*, 332 S.W.3d at 442; *Malone*, 253 S.W.3d at 257. No precise rule can be formulated as to the amount of evidence that is required to corroborate the testimony of an accomplice. *Dowthitt*, 931 S.W.2d at 249. But, the "tends to connect" standard is not a high threshold. *Cantelon*, 85 S.W.3d at 461.

It is sufficient corroboration if the combined force of all the non-accomplice evidence shows that rational jurors could have found that it sufficiently tended to connect the defendant to the offense. *Smith*, 332 S.W.3d at 442; *Malone*, 253 S.W.3d at 257. Therefore, "when there are two permissible views of the evidence (one tending to connect the defendant to the offense and the other not tending to connect the defendant to the offense)," we defer to the view of the evidence chosen by the jury. *Simmons v. State*, 282 S.W.3d 504, 508 (Tex. Crim. App. 2009); *see also Smith*, 332 S.W.3d at 442. It is not appropriate for us to independently construe the non-accomplice evidence. *Smith*, 332 S.W.3d at 442.

The jury was instructed that Higgs was an accomplice and that it could not convict Cannon on Higgs's testimony alone. Assuming that Steele was also an accomplice, in conducting our review of the sufficiency of the corroborative evidence, we must eliminate Higgs's and Steele's testimony from consideration and look to the remaining portions of the record to determine if there is any evidence that tends to connect Cannon with the commission of the crime. A.B. testified she was delivering a big pizza order on July 24, 2012. She stopped at the address she had been given and saw Higgs, who later disappeared around the side of the house. Higgs returned and was walking toward A.B. when she was struck several times on the side of the head by another individual. A.B. was then robbed and sexually assaulted. Although A.B. did not see her attacker's face, she could see a bright light like a camera light on a phone. Cannon later showed the video of A.B. to Charles and Freshwater. Both men testified the video showed A.B. lying on the ground. The phone video camera turned to show Cannon and the gun, and Charles and Freshwater could hear Cannon demanding money from A.B. We conclude a rational jury could have found the non-accomplice evidence tended to connect Cannon with the robbery. Accordingly, Higgs's and Steele's testimony was sufficiently corroborated. Further, even excluding the evidence provided by Higgs and Steele, the remaining evidence at trial was

–10–

sufficient to support the jury's verdict. *See Jackson*, 443 U.S. at 319; *Matlock*; 392 S.W.3d at 667. We resolve Cannon's first issue in the aggravated robbery case against him.

## Jury Charge Error

In his second, third, and fourth issues in the aggravated robbery case and his first and second issues in the aggravated sexual assault case, Cannon contends the trial court submitted an erroneous jury charge in each case. Cannon made no objection in the trial court to either charge.

### *Standard of Review*

Our first duty in analyzing a jury-charge issue is to decide whether error exists. *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012). If error exists, we must determine whether the error caused sufficient harm to warrant reversal. *Ngo v. State,* 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005). When, as in this case, the error was not objected to, the error must be "fundamental" and requires reversal "only if it was so egregious and created such harm that the defendant 'has not had a fair and impartial trial.'" *Barrios v. State*, 283 S.W.3d 348, 350 (Tex. Crim. App. 2009) (quoting *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g)). Egregious harm exists when the record shows that a defendant has suffered actual, rather than merely theoretical, harm from jury-charge error. *Almanza*, 686 S.W.2d at 174. Egregious harm consists of error affecting the very basis of the case, depriving the defendant of a valuable right, or vitally affecting a defensive theory. *See Cosio v. State*, 353 S.W.3d 766, 777 (Tex. Crim. App. 2011). In determining whether the error was so egregious that the defendant was denied a fair and impartial trial, we examine: (1) the entire jury charge; (2) the state of the evidence; (3) the arguments of counsel; and (4) any other relevant information in the record. *Ngo*, 175 S.W.3d at 750 n.48 (citing *Almanza*, 686 S.W.2d at 171).

–11–

*Accomplice-Witness Instruction*

In his second issue in the aggravated robbery case, Cannon claims the trial court erred by failing to instruct the jury that Steele was an accomplice as a matter of law. The State concedes Steele was an accomplice and that the jury should have been so charged. We agree. *See Druery v. State*, 225 S.W.3d 491, 498 (Tex. Crim. App. 2007) ("An accomplice is someone who participates with the defendant before, during, or after the commission of a crime and acts with the required culpable mental state."); *Herron v. State*, 86 S.W.3d 621, 631 (Tex. Crim. App. 2002) ("If a prosecution witness is an accomplice as a matter of law, the trial court is under a duty to instruct the jury accordingly."); *see also Casanova v. State*, 383 S.W.3d 530, 533 (Tex. Crim. App. 2012). We therefore turn to whether Cannon was egregiously harmed by the error.

The accomplice-witness instruction informs the jury that it cannot use the accomplice-witness testimony unless there also exists some non-accomplice evidence connecting the defendant to the offense. *Herron*, 86 S.W.3d at 632. Therefore, non-accomplice evidence can render harmless a failure to submit an accomplice-witness instruction by fulfilling the purpose the instruction is meant to serve. *Id.* Whether the trial court's error in failing to submit an accomplice-witness instruction is harmful is "a function of the strength of the corroborating evidence." *Casanova*, 383 S.W.3d at 539.

In our review of Cannon's sufficiency challenge, we examined the evidence of record after excluding the evidence provided by Higgs and Steele. The other evidence adduced at trial was sufficient by itself to support Cannon's conviction as well as to corroborate the testimony of Higgs and Steele. Under these circumstances, we cannot conclude Cannon has shown the failure to instruct the jury that Steele was an accomplice was so egregious and created such harm that Cannon did not have a fair and impartial trial. *Id.* at 539–40 ("[A]s the corroborating evidence gains in strength to the point that it becomes implausible that a jury would fail to find that it

tends to connect the accused to the commission of the charged offense, then a reviewing court may safely conclude that the only resultant harm is purely theoretical and that there is no occasion to reverse the conviction, even in the face of an objection, since the jury would almost certainly have found that the accomplice witness's testimony was corroborated had it been properly instructed that it must do so in order to convict."). We resolve Cannon's second issue in the aggravated robbery case against him.

*Definition of Reasonable Doubt*

In his second issue in the aggravated sexual assault case and his fourth issue in the aggravated robbery case, Cannon asserts the trial court erred by submitting a charge to the jury that contained a definition of reasonable doubt. Cannon specifically complains about the instruction in the jury charge that "It is not required that the prosecution prove guilt beyond all possible doubt; it is required that the prosecution's proof excludes all reasonable doubt concerning the defendant's guilt." The court of criminal appeals has concluded a trial court does not abuse its discretion by giving the instruction. *Mays v. State*, 318 S.W.3d 368, 389 (Tex. Crim. App. 2010) (citing *Woods v. State*, 152 S.W.3d 105, 114 (Tex. Crim. App. 2004)); *see also O'Canas v. State*, 140 S.W.3d 695, 702 (Tex. App.—Dallas 2003, pet. ref'd) (complained-about instruction "simply states the legally correct proposition that the prosecution's burden is to establish proof beyond a *reasonable* doubt and not *all possible* doubt" and does not define "reasonable doubt"). Accordingly, we resolve these issues against Cannon.

*Definitions of Mental States*

In his first issue in the aggravated sexual assault case and his third issue in the aggravated robbery case, Cannon asserts the trial court erred by failing to limit the definitions of intentionally and knowingly in the jury charge to the applicable conduct elements of aggravated

sexual assault (nature of conduct offense) and of aggravated robbery (nature, result, and circumstance of conduct offense).

There are three "conduct elements" that can be involved in an offense: (1) the nature of the conduct, (2) the result of the conduct, and (3) the circumstances surrounding the conduct. TEX. PENAL CODE ANN. § 6.03 (West 2011); *McQueen v. State*, 781 S.W.2d 600, 603 (Tex. Crim. App. 1989). An offense may contain one or more of these "conduct elements," which alone or in combination form the overall behavior that the legislature intended to criminalize, and it is those "conduct elements" to which a culpable mental state may apply. *McQueen*, 781 S.W.2d at 603. A trial court errs by failing to limit the definitions of the culpable mental states to the conduct element or elements of the offense to which they apply. *Patrick v. State*, 906 S.W.2d 481, 492 (Tex. Crim. App. 1995); *Cook v. State*, 884 S.W.2d 485, 491 (Tex. Crim. App. 1994); *Ash v. State*, 930 S.W.2d 192, 194 (Tex. App.—Dallas 1996, no pet.).

Here, the trial court properly instructed the jury on the elements of each offense; however, in each case, it instructed that:

> A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.

> A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

Aggravated robbery is a nature, result, and circumstances of the conduct offense, *see Ash*, 930 S.W.2d at 195; aggravated sexual assault is a nature of the conduct offense. *See Gonzales v. State*, 304 S.W.3d 838, 847 (Tex. Crim. App. 2010).

The State concedes, and we agree, that the trial court erred by not limiting the statutory definitions of "intentionally" or "knowingly" to the conduct element or elements of the offenses

to which they apply. However, we conclude Cannon has failed to show egregious harm mandating reversal. Before it could find Cannon guilty of aggravated sexual assault, the charge required the jury to find, beyond a reasonable doubt, that Cannon intentionally or knowingly caused the penetration of A.B.'s sexual organ without her consent by means of Cannon's hand or finger and that in the course of this episode, Cannon used or exhibited a firearm or that Cannon intentionally or knowingly caused the penetration of A.B.'s sexual organ without her consent by means of Cannon's hand or finger and that in the course of this episode, Cannon placed A.B. in fear that death or serious bodily injury would be imminently inflicted upon her. In the aggravated robbery case, the charge required the jury to find, beyond a reasonable doubt, that Cannon did intentionally or knowingly, while in the course of committing theft of property and with intent to obtain or maintain control of said property, cause bodily injury to A.B., by striking her in the head multiple times with a firearm, and Cannon, either acting alone or as a party, used or exhibited a firearm, a deadly weapon. Each charge correctly instructed the jury on the substantive law of the case and informed the jury of what the State was required to prove in each case. *See Bazanes v. State*, 310 S.W.3d 32, 37 (Tex. App.—Fort Worth 2010, pet. ref'd). The charge also correctly addressed the presumption of innocence and the State's burden of proof. *Id.*

> Further, with respect to the aggravated robbery case, the jury charge provided:

> if you find and believe from the evidence beyond a reasonable doubt that [Cannon], on or about the 24th day of July, A.D., 2012 . . . did then and there intentionally or knowingly, while in the course of committing theft of property and with intent to obtain or maintain control of said property, cause bodily injury to another [A.B.] hereinafter called complainant, by striking complainant in the head multiple times with a firearm, and the defendant, either acting alone or as a party, used or exhibited a deadly weapon, to-wit: a firearm, then you will find the defendant guilty of the offense of aggravated robbery[.]

The charge properly described the manner and means used by Cannon to commit the aggravated robbery of A.B., "by striking complainant in the head multiple times with a firearm" and by

using or exhibiting a deadly weapon and, therefore, limited the definition to the result of Cannon's conduct. *See Ash*, 930 S.W.2d at 195. Within the context of the charge as a whole, the error does not appear to have caused egregious harm to Cannon. *See Bazanes*, 310 S.W.3d at 37.

As to the state of the evidence, intent was not a contested issue at trial. The parties did not argue about Cannon's intent in closing argument, instead focusing on whether the State's witnesses were credible. There was no evidence of circumstances that would have led the jury to find that Cannon had not acted with the specific intent necessary to complete the crimes. *See Rodriguez v. State*, 24 S.W.3d 499, 503 (Tex. App.—Corpus Christi 2000, pet. ref'd). Based on the entire appellate record, we conclude Cannon did not suffer egregious harm from the complained-of error in the jury charge. We resolve Cannon's first issue in the aggravated sexual assault case and his third issue in the aggravated robbery case against him.

We affirm the trial court's judgments.


/Robert M. Fillmore/
ROBERT M. FILLMORE
JUSTICE


Do Not Publish
Tex. R. App. P. 47

131109F.U05

–16–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

FERRIOUS CANNON, Appellant

No. 05-13-01109-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court
No. 5, Dallas County, Texas,
Trial Court Cause No. F12-31283-L.
Opinion delivered by Justice Fillmore,
Justices Evans and Lewis participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 7th day of July, 2014.



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

FERRIOUS CANNON, Appellant

No. 05-13-01110-CR        V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court
No. 5, Dallas County, Texas,
Trial Court Cause No. F12-31231-L.
Opinion delivered by Justice Fillmore,
Justices Evans and Lewis participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 7th day of July, 2014.